UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ X
RYAN HORTON,

                                        Plaintiff,

                        -against-

COUNTY OF NASSAU, NASSAU COUNTY SHERIFF
ANTHONY J. LaROCCO, in his individual and official
capacities, LT. DONNERY, in his individual and official
capacities, CORRECTIONS OFFICER HOLMES, in his
individual and official capacities, and CORRECTIONS
OFFICER JOHN DOES #1-10 (fictitiously named), in their
individual and official capacities,

                                        Defendants.
------------------------------------------------------------------------ X

**Docket No.: 2:24-cv-07883**
**(SJB)(AYS)**


**AMENDED COMPLAINT**



**JURY TRIAL DEMANDED**

        Plaintiff RYAN HORTON, by his attorneys Horn Wright, LLP, complaining of Defendants

COUNTY OF NASSAU, NASSAU COUNTY SHERIFF ANTHONY J. LaROCCO, in his

individual and official capacities, LT. DONNERY, in his individual and official capacities,

CORRECTIONS OFFICER HOLMES, in his individual and official capacities, and

CORRECTIONS OFFICER JOHN DOES #1-10 (fictitiously named), in their individual and

official capacities, alleges as follows:

<u>**PRELIMINARY STATEMENT**</u>

        1.        This is a civil rights action in which Plaintiff RYAN HORTON ("HORTON" and/or

"Plaintiff") seeks relief from Defendants COUNTY OF NASSAU, NASSAU COUNTY SHERIFF

ANTHONY J. LaROCCO, LT. DONNERY, CORRECTIONS OFFICER HOLMES, and

CORRECTIONS OFFICER JOHN DOES #1-10 (hereinafter, collectively "Defendants"),

committing acts under color of law and depriving Plaintiff of rights secured under 42 U.S.C. §

1983 grounded in rights secured to him under the First, Fifth, Eighth, and Fourteenth Amendments to the Constitution of the United States and laws of the State of New York.

2.      Plaintiff alleges that Defendants have engaged and continue to engage in unlawful conduct. Specifically, during the course of Plaintiff's pre-trial detention at the Nassau County Correctional Center ("NCCC"), Plaintiff has:

a.   been denied access to the Courts;

b.   been denied access to the grievance process;

c.   been denied access to the medical clinic;

d.   been denied visits from his family and/or friends;

e.   had his visits restricted without process;

f.   been denied his mail and/or received mail weeks later;

g.   been subjected to inhumane conditions that pose unreasonable and substantial risks to his health;

h.   been denied commissary; and

i.   been forced to work without proper and just compensation.

3.      Plaintiff seeks damages, both compensatory and punitive, award of costs, disbursements, interest, attorney's fees, and such other and further relief as this Court deems just and equitable.

## **JURISDICTION**

4.      This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988 and the First, Fifth, Eighth, and Fourteenth Amendments of the United States Constitution. Jurisdiction is conferred upon this Court by 42 U.S.C. § 1983 and by 28 U.S.C. §§ 1331 and 1343(3) and (4) of the aforementioned Constitutional provisions.

**VENUE**

5.      Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b) since all of the events and omissions giving rise to Plaintiff's claims occurred within the County of Nassau; the actual place of employment of the individually named Defendants and CORRECTIONS OFFICER JOHN DOES #1-10 is within the County of Nassau in the Eastern District of New York; and the County of Nassau is within the jurisdiction of the Eastern District of New York. The events surrounding this lawsuit occurred in the County of Nassau, in the Eastern District of New York.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

6.      Plaintiff attempted to fulfill the requirements of the Prison Litigation Reform Act, 42 U.S.C. § 1997(e)(a), requiring detainees to exhaust available, administrative remedies prior to filing suit under 42 U.S.C. § 1983 alleging violations of his Constitutional rights but was denied access to the process and/or prevented from filing such.

**THE PARTIES**

7.      Plaintiff RYAN HORTON ("HORTON" or "Plaintiff") is presently a pretrial detainee at the NCCC, located at 100 Carman Avenue, East Meadow, County of Nassau, New York. At all relevant times described herein, Plaintiff was a pretrial detainee in the custody and care of Defendants.

8.      Upon information and belief, at all relevant times described herein, Defendant COUNTY OF NASSAU ("COUNTY") was and continues to be a municipal corporation organized and existing by virtue of the laws of the State of New York.

9.      At all relevant times herein, NASSAU COUNTY SHERIFF ANTHONY J. LaROCCO ("LaROCCO") was and is the Sheriff of the County of Nassau, acting under color of

state law, and is responsible for providing a safe and secure environment for detainees in his custody. LaROCCO is being sued in his individual and official capacities. Defendant LaROCCO is responsible for the day-to-day operations of NCCC. As Sheriff, he has custody, control, and charge of the NCCC and its inmates. LaROCCO is legally responsible, in whole or in part, for the operation of the NCCC, for the conditions therein, and the health and safety of persons confined or incarcerated therein. As Sheriff, LaROCCO has final policy-making authority for all matters relating to the operation of NCCC, including final policy-making authority and ultimate responsibility for the custody, treatment, control, and care of all persons detained in NCCC. The individuals working at NCCC are Defendant LaROCCO's agents and employees.

10. Upon information and belief, at all relevant times described herein, Defendant LT. DONNERY ("DONNERY") is an individual employed by COUNTY with an actual place of employment within the County of Nassau, State of New York, who is being sued in his individual and official capacities. At all relevant times described herein, DONNERY was acting under color of state law within the scope of his employment as a Supervisor employed by Defendant COUNTY, and works under the supervision, direction, and/or control of the supervisors in Nassau County Sheriff's Department ("NCSD") and NCCC.

11. Upon information and belief, at all relevant times described herein, Defendant CORRECTIONS OFFICER HOLMES ("HOLMES") is an individual employed by COUNTY with an actual place of employment within the County of Nassau, State of New York, who is being sued in his individual and official capacities. At all relevant times described herein, HOLMES was acting under color of state law within the scope of his employment as a Corrections Officer employed by Defendant COUNTY, and works under the supervision, direction, and/or control of the supervisors in NCSD and NCCC.

12.     Upon information and belief, at all relevant times described herein, Defendant CORRECTIONS OFFICER JOHN DOES #1-10 (fictitiously named) ("DOES") are individuals and employees of COUNTY with an actual place of employment within the County of Nassau, State of New York, who are being sued in their individual and official capacities. At all relevant times described herein, DOES were acting under color of state law and within the scope of their employment as Corrections Officers and/or Supervisors employed by Defendant COUNTY, and work under the supervision, direction, and/or control of their supervisors in the NCSD, NCCC, and LaROCCO. They are legally responsible, in whole or in part, for the operation of the NCCC, for the conditions therein, and the health and safety of persons confined or incarcerated therein.

13.     Upon information and belief, at all relevant times described herein, Defendant COUNTY, by its agents and/or employees, operated, maintained, and controlled the NCSD, including the NCCC and all Corrections Officers thereof, and is responsible for providing a safe and secure environment for detainees in its custody.

14.     Upon information and belief, at all relevant times described herein, NCSD, by its agents and/or employees, operated, maintained, and controlled the NCCC and all Corrections Officers thereof, and is responsible for providing a safe and secure environment for detainees in its custody.

## FACTUAL BACKGROUND

15.     Plaintiff at all relevant times has been a detainee at the NCCC.

16.     Defendants have denied Plaintiff, and others, the most basics of fundamental human rights.

17.     The "law library" maintained by Defendants is devoid of any legal referenced material, books, pens or pencils, paper, typewriter, photocopy machine and/or computers to electronically access legal reference material or information about criminal matters or civil matters.

18.     The "law library" is an area within the main building of the NCCC which has a long desk with three (3) desktops. These desktops, upon information, are not connected to the internet.

19.     Upon information, the desktop merely operates a CD and/or installed program containing reference material from 2010. Detainees are not able to research and/or access current administrative codes, regulations, New York state statutes, US Code, and/or case law. There is no ability to shepardize and/or Keycite function.

20.     The "law library" is staffed by DONNERY and HOLMES. These individuals, as well as other NCSD personnel that staff the "law library" at times, have no training or knowledge of the law, conducting legal research, basic criminal or civil procedure, and/or the individual rules of the Courts.

21.     Defendants offer no assistance whatsoever to detainees that schedule time at the "law library." In point of fact, Defendants do not even allow and/or permit the photocopying of legal material. A sign is posted at the "law library" which reads "no copies, no court dates, no warrant check", denying detainees the most basic of information regarding their criminal and/or civil matters.

22.     Detainees are forced to copy material by handwriting everything on small scraps of paper or on the back of used paper with writing utensils that they have purchased. Plaintiff and

other detainees are not even provided carbon paper to ease the burden of having to write multiple copies of any legal work.

23.    Plaintiff's access to the "law library," as well as that of other detainees, is inconsistent. Access to the "law library" is not provided on a consistent and regular basis and, on many occasions, is restricted in time. This is despite there being Court orders directing additional time to be provided. Defendants have and continue to disregard valid orders from the Courts directing Defendants to provide additional library time. Moreover, the sessions take into account the time required for the detainee to be transported and/or moved from the detainee's housing area to the "law library" which further restricts the time allotted for "law library" time.

24.    Defendants have utterly failed to provide Plaintiff, as well as other detainees, with meaningful access to the Courts. As a result of Defendants' Constitutional violation, Plaintiff is unable to meaningfully participate in the defense of his criminal matter.

25.    Defendants' unlawful conditions and conduct further prevents Plaintiff, as well as other detainees, from being able to fully grieve conditions at NCCC. The lack of access to writing utensils, photocopy machines, envelopes, legal reference material, typewriters, and/or desktops with word processing capabilities means that Plaintiff, as well as other detainees, cannot fully grieve their conditions of confinement as they cannot access reference material.

26.    Defendants' unlawful conditions and conduct further prevent Plaintiff, as well as other detainees, from being able to properly and meaningfully defend themselves when they are written up on disciplinary charges. The lack of access to writing utensils, photocopy machines, envelopes, legal reference material, typewriters, and/or desktops with word processing capabilities result in Plaintiff, as well as other detainees, not being able to put up a meaningful defense when disciplinary charges are levied against them. Moreover, the "law library" is not staffed with

individuals with any sort of legal knowledge that could provide a modicum of guidance or instruction to Plaintiff or other detainees.

27.    Defendants have further restricted Plaintiff's access to the Courts by not delivering his legal mail in a timely manner which has included important discovery material related to his criminal case.

28.    The inability to review discovery material relevant to his criminal case prevent Plaintiff from participating in his criminal defense.

29.    The "law library" is completely devoid of any reading material, books, or reference material to aid and assist Plaintiff and/or other detainees. Further, the law library has no competent personnel that can assist Plaintiff or others.

**Lack of Grievance Process**

30.    Plaintiff, as well as other detainees, lack the ability to meaningfully grieve conditions at NCCC.

31.    Defendants COUNTY, LaROCCO, and DOES employ a policy of "front-desking." In other words, Defendants encourage and/or dissuade Plaintiff, and other detainees, from actually filing a grievance. That is, grievances are either not accepted, not allowed, not collected, thrown in the garbage, or not provided to Plaintiff and others.

32.    Defendants either deny the grievance on absurd procedural grounds or delay detainees, such as Plaintiff, from filing the grievance by either not providing the proper forms, not accepting the grievance, or not collecting the grievance so that when the grievance reaches the purported grievance coordinator it is deemed untimely and summarily rejected.

33. Defendants further restrict detainees, such as Plaintiff, from fully exhausting the administrative process by refusing to accept and/or permit an appeal of the grievance coordinators' determination.

34. By way of example, the grievance coordinator will at times withhold the grievance form and indicate that the detainee accepted the determination but refused to sign the grievance form when in truth a detainee is requesting to check-off the "appeal" box.

35. In other instances, the grievance coordinator may accept the grievance, but no corrective action is taken by the facility. Thus, a detainee is left to have to continuously grieve an issue without Defendants correcting the issue complained of. Defendants will then begin to deny and/or reject the grievance due to the grievance having already been "addressed" by Defendants.

36. When a detainee, such as Plaintiff, attempts to appeal a grievance despite Defendants' obstructionist conduct, the appeal officer will summarily deny the appeal for purportedly not following the proper process, being vague, or some other hyper technical absurdity.

37. The grievance process is crucial for ensuring fair treatment of detainees, providing a formal channel for complaints, potentially preventing lawsuits, and in having an orderly facility. It allows detainees to voice concerns about conditions or treatment and provides a mechanism for resolving issues before they escalate into more serious problems or legal disputes. It further prevents minor issues from escalating into larger problems, avoiding conflict between detainees, avoiding conflict between detainees and corrections officers, and avoids violence and disturbances at the facility.

38. Defendants' conduct further has the effect of denying Plaintiff, and others, the ability to redress Defendants' unlawful conduct in the Courts.

**Conditions at NCCC**

39.     NCCC has a history of violating minimum health and safety standards for correctional facilities in the State of New York[1]. In a 2011 letter to then Acting Sheriff Sposato, Thomas A. Beilein, Chairman of the State Commission of Correction, outlined a series of long-standing violations at the jail. Per the Commission, of the 27 violations cited by NYS, 14 violations remain, including poor maintenance of the shower units as well as not correcting sanitation violations cited over the past 27 months. Beilein stated that "[t]his is a . . . chronicle of widespread and persistent violations of state regulations," that COUNTY should have established a plan to clean and maintain.

40.     Starting on or about November 19, 2023, Plaintiff was forced to live in squalid, unhygienic, and hazardous living conditions that pose a substantial and ongoing risk to his physical and mental health. Many of the individuals detained in NCCC have been housed in other correctional facilities as the result of either transfers or previous or subsequent incarcerations, and they describe the uninhabitable conditions at the NCCC as the worst conditions of any jail or prison they have known.  On information and belief, all of the conditions described herein have persisted regularly since at least 2011.

41.     NCCC's plumbing problems have created an unsanitary environment for the individuals detained there by exposing them to constant flooding and human waste on a regular and ongoing basis.

42.     The poor plumbing causes the toilets and sinks, contained within each of the individual cells in the dorms, to constantly flood and/or leak.

---

[1]     See      https://www.nytimes.com/2000/09/16/nyregion/14-month-federal-study-denounces-cruel-conditions-at-the-nassau-county-jail.html

43.     In addition to the plumbing issues, NCCC's HVAC systems is either too cold at times or too hot. There is improper air circulation which exacerbates the mold conditions in many of the housing areas.

44.     The roof at the correctional facility is in such disrepair that it is constantly leaking. During any rainstorm, water seeps into the dorms through the ceiling and light fixtures, causing water to accumulate in the sleeping areas and common areas. In an attempt to alleviate some of these problems, NCCC staff would overhang plastic tarps on the ceilings in order to catch and divert water.

45.     On information, the roof was in such disrepair that on one occasion there was a partial roof collapse.

46.     Nearly every night, when the detainees are sleeping (and cannot make a plea for assistance), water and waste would accumulate in the cells and sometimes overflow onto the cell floors. The water accumulation would be even worse on nights and/or days when it rained.

47.     The common areas of the dorms would similarly get flooded as water seeped out from the cells, or from the poor plumbing in the showers or leaks from the roof.

48.     Detainees wake up daily to accumulated water and waste, causing them to regularly vomit, cough, and suffer from nausea and severe headaches due to the fumes.

49.     The showers at NCCC are decrepit, coated in black mold, and reek of mildew.  The faucets and pipes are rusted over and constantly leak.

50.     At times, sewage backs up out of the shower drains, and there is often standing water in the showers because the drains are frequently clogged.

51.     When Plaintiff and other NCCC detainees shower, they try to not touch anything in the showering area in an attempt to avoid contact with the mold, mildew, rust, and possible sewage.

52.     Moreover, there is no recreational reading material provided to detainees, no radios or music is allowed, and no educational or vocational services are provided to detainees. Apart from providing GED programs, Defendants provide no further educational programs or access to online courses.

53.     Additionally, Defendants provide no transitional programs or access to services for individuals once they are released from custody.

**Lack of Nutritious Meals**

54.     Plaintiff is being denied proper meals. The meals served are insufficient, calorie intake wise and/or daily nutrition intake. The food at many times is simply inedible. The food preparation is unsanitary. The food is served cold and even at times spoiled food is served.

55.     Food supplies that are supposed to be for detainees' meals is entirely diverted to the staff and the "officers' mess hall." To the point that even simple condiments such as salt, pepper, and ketchup are all diverted to the "officers' mess hall" all free of charge to the employees.

56.     As a result, Plaintiff and other detainees are forced to obtain meals from NCCC's Commissary. However, the Commissary food items are so overpriced that it is not practicable to purchase food from there at all times. Further, Defendants deliberately break apart food items to sell them individually so as to extract a greater unit price per item. This is despite the fact that said food items are to be sold as packaged.

57.     Moreover, the proceeds from Commissary are supposed to be used for detainee welfare and rehabilitation programs. Upon information, these funds are being improperly diverted

by Defendants to other impermissible uses. There has been no oversight by Defendant COUNTY of the use of these proceeds.

58.     Upon information, there have been no inspections conducted of the food and/or preparation area by the Nassau County Health Department or other oversight state agency.

**Detainee Work Program**

59.     Plaintiff, as well as other detainees, work at NCCC by either preparing meals, delivering meals, and/or performing janitorial jobs.

60.     Defendants do not pay Plaintiff, or for that matter other detainees, for any of his labor.

61.     Plaintiff, and other detainees, are forced to work at NCCC without any compensation.

**Visitations**

62.     Defendants have restricted Plaintiff's visitation since on or about September 2024. This restriction is purportedly based upon one of Plaintiff's visitors having contraband on her/his person.

63.     Plaintiff was never written up nor charged with any disciplinary offense for this purported incident.

64.     Defendants did not hold a disciplinary hearing in connection with this purported incident, nor did Plaintiff have an opportunity to dispute Defendants' imposed restriction.

65.     Plaintiff has filed multiple grievances which have been ignored and not responded to by Defendants.

66.     As a result of this visitation restriction, Plaintiff is permitted only two visits per week. The restriction is applied to Plaintiff's legal visits as well. Thus, if Plaintiff's criminal

counsel and civil counsel visit Plaintiff in the same week, Plaintiff will not be permitted any other visits. Similarly, if Plaintiff has two separate visits from family and/or friends, Plaintiff will not be permitted any legal visits. Defendants' visitation restriction serves no reasonable pedagogical function. Moreover, Plaintiff's visits with family and friends are "no contact visits."

67.     As a result, Plaintiff at times is relegated to making calls to friends and family. However, the phone services at the facility are so exorbitantly priced that it is not financially feasible for Plaintiff to maintain contact with his family.

**Denial of Access to Medical**

68.     On or about February 2025, Plaintiff received an injury to his shoulder and neck while working out. Plaintiff has made several sick-call requests which are ignored by Defendants COUNTY, LaROCCO, and DOES.

69.     Similarly, approximately one month ago, Plaintiff sustained a foot injury. Plaintiff woke up with a swollen foot. Plaintiff's foot remains swollen to this day causing severe pain when walking. The pain from these injuries is further causing Plaintiff to be unable to sleep at night.

70.     Plaintiff has made multiple sick-call requests to be seen by medical personnel for his injuries to his neck, shoulder, and foot. However, Defendants COUNTY, LaROCCO, and DOES have refused to accept Plaintiff's sick-call requests and have refused to bring Plaintiff to medical to be seen by a medical professional.

71.     Defendants further refuse to allow Plaintiff to be seen by an orthopedic doctor. In point of fact, there has not been an orthopedic doctor at NCCC since February of 2025.

72.     On the rare occasion Plaintiff is seen by medical staff, the consultations are not private. That is, correctional staff is present and within hearing of all conversations between the medical personnel and the patient, such as Plaintiff.

**Nassau County Correctional Center Board of Visitors**

73.     In 1990, Nassau County residents overwhelmingly approved an amendment to the Nassau County Charter to establish the Nassau County Correctional Center Board of Visitors ("Board of Visitors").

74.     The Board of Visitors was to be a seven-member independent oversight committee meant to respond to inmate grievances and advise the Sheriff on programs that would improve the care and treatment of detainees housed at NCCC. Since then, Defendant COUNTY has consistently failed to appoint members to the Board of Visitors.

75.     In April of 2013, after a suit brought by the New York Civil Liberties Union ("NYCLU"), Defendant COUNTY was ordered to comply with the Nassau County Charter mandate. In his decision, Judge James P. McCormack stated that "the language of the Charter is unequivocal and it clearly directs the County Executive to fill the seven member Board of Visitors in a manner consistent with the Nassau County Charter." *Marone, et al. v. Nassau County, et al.*, 003630/2012 (NC. Sup. 2013)

76.     Upon information, Defendant COUNTY has not fully implemented the Board of Visitors. Per Defendant COUNTY's own website, the Board of Visitors' last meeting was held on January 28, 2021. *See* https://www.nassaucountyny.gov/4413/Nassau-County-Correctional-Center-Board-

77.     The Board of Visitors is to serve three-year terms and have some "working knowledge of the correctional system." The committee is required to have an office at the jail and access to jail records, books, and data. Board of Visitor members would be appointed by the county executive and serve without compensation.

78.     The entire purpose of the Board of Visitors is to have independent oversight of the NCCC which is unquestionably needed given the present conditions at NCCC.

79.     Defendants are well aware of the conditions at NCCC and the treatment of detainees housed therein.

80.     COUNTY, through NCSD and the County Executive, have engaged in a pattern and practice of deliberate indifference to the inhumane and unconstitutional conditions at NCCC.

81.     COUNTY has systematically and deliberately ignored or failed to take reasonable measures to address the visibly deplorable and unconstitutional conditions at NCCC. As described in detail in this Complaint, the facilities are constantly flooded by either water or human waste, filled with rust and holes, and the roof is in complete disrepair adding to leaks and water accumulation in many areas inside the facilities. Areas of the walls, ceilings, and showers are covered in black mold, and detainees are forced to live in and be exposed to each other's filth and waste.

82.     COUNTY has also systematically and deliberately ignored and/or failed to take reasonable measures to address the complaints about the deplorable and unconstitutional conditions raised by the detainees in NCCC. For years, the men detained in NCCC have submitted grievances through NCCC's complaint procedures describing the conditions set forth in this Complaint and have sought medical treatment for their injuries arising from these conditions.

83.     These grievances, as detailed herein, have been ignored and/or "front-desked" by Defendants.

84.     These uninhabitable and hazardous conditions are the product of decades of neglect and the refusal by COUNTY to adequately maintain NCCC and ensure that there are appropriate and humane conditions for its detainee population.

85.     COUNTY knew or should have known that NCCC was not properly operated, maintained, has been permitted to fall into total disrepair, and that this continued failure to address the problem has reached desperate proportions.

86.     The foregoing policies, acts, inactions, omissions, and systematic failures are the official policies, practices, and customs of Defendant COUNTY. The foreseeable result of these policies, practices, and customs was the further deterioration of the already inhumane conditions at NCCC.

87.     Defendant COUNTY was deliberately indifferent to the unconstitutional conditions at NCCC and established a policy, practice, and/or custom of approving and tolerating the unconstitutional conditions by refusing to remediate them.

88.     Despite knowledge of such unlawful policies, practices, and/or customs, Defendant COUNTY's policy-making officials and officials with oversight responsibilities over NCCC have not taken steps to terminate or remediate these policies, practices, and/or customs and, instead, have supported, ratified, or implemented these policies, practices, and/or customs through their active encouragement or deliberate indifference to the effect of such policies, practices, and/or customs upon the Constitutional rights of persons in their care or custody.

89.     As a direct and proximate result of COUNTY's persistent and widespread practice and official policy of failing to provide for even the most basic of necessities to detainees and/or necessary and urgent repairs of the facilities, or to even minimally address decades of overcrowding, the men detained in NCCC have been forced to live in inhumane conditions that deprive them of their Constitutional rights.

90.     The injuries Plaintiff suffered were caused solely by the conduct of Defendants, and Plaintiff in no way contributed to or caused the injuries he suffered.

91.     Defendants' intentional, reckless, negligent, or deliberately indifferent behavior caused Plaintiff conscious pain and suffering, permanent physical injuries, and emotional harm.

92.     Defendants were aware and knew and/or had reason to know of the substantial risk to Plaintiff, and individuals like Plaintiff, to his physical and mental health and safety. Despite this knowledge, Defendants disregarded said risk.

93.     Defendants were well aware of the inhumane, toxic, and dangerous conditions at NCCC but failed to take any measures to correct and/or repair same.

**COUNT I**
**DENIAL OF ACCESS TO THE COURTS**
**(_Against All Defendants_)**

94.     Plaintiff repeats, reiterates, and realleges each and every allegation contained in all other paragraphs of the Complaint herein with the same force and effect as if more fully set forth at length below.

95.     Defendants' conduct as described herein violates the First, Fifth, and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983 by denying Plaintiff access to the Courts; the ability to participate in the defense of his criminal case; have meaningful access to legal material; have meaningful access to legal assistance; have confidential legal communications with his attorneys; and providing a law library.

96.     The First and Fourteenth Amendment affords pretrial detainees at least the same rights as those afforded convicted prisoners, if not greater rights. In light of the totality of the circumstances discussed in detail above, Defendants - acting under color of state law - have denied Plaintiff access to the Courts and have denied him the ability to meaningfully participate in his defense.

97.     As a proximate result of Defendants' intentional, wanton, reckless, grossly negligent,

98.     and deliberately indifferent actions, Plaintiff was caused to sustain bodily injuries, mental torment, night terrors and nightmares, depression, fear, loss of enjoyment of life, and other physical, mental, and psychological injuries, other special damages, has suffered great mental anguish, and has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling, all to Plaintiff's damage, in an amount to be determined at trial but not less than ONE MILLION DOLLARS ($1,000,000.00), plus punitive damages and attorney's fees.

## COUNT II
## DELIBERATE INDIFFERENCE TO PAST, CURRENT, AND ONGOING UNCONSTITUTIONAL CONDITIONS AT NCCC UNDER THE FOURTEENTH AMENDMENT
### *(Against All Defendants)*

99.     Plaintiff repeats, reiterates, and realleges each and every allegation contained in all other paragraphs of the Complaint herein with the same force and effect as if more fully set forth at length below.

100.    The Due Process Clause of the Fourteenth Amendment affords pretrial detainees at least the same rights as those afforded convicted prisoners, if not greater rights. In light of the totality of the circumstances discussed in detail above, Defendants - acting under color of state law - have subjected Plaintiff to conditions of confinement that expose Plaintiff to a substantial risk of serious physical and psychological harm and, as such, constitute unlawful punishment in violation of the Fourteenth Amendment.

101.    Defendants have subjected and continue to subject Plaintiff and other inmates to cruel and inhumane prison conditions that damaged them and which pose an unreasonable and

unjustifiable risk of harm to their health, and have manifested and continue to manifest a pattern of deliberate indifference to this damage and risk of harm. The challenged conditions violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

102. As a proximate result of Defendants' intentional, wanton, reckless, grossly negligent, and deliberately indifferent actions, Plaintiff was caused to sustain bodily injuries, mental torment, night terrors and nightmares, depression, fear, loss of enjoyment of life, and other physical, mental, and psychological injuries, other special damages, has suffered great mental anguish, and has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling, all to Plaintiff's damage, in an amount to be determined at trial but not less than ONE MILLION DOLLARS ($1,000,000.00), plus punitive damages and attorney's fees.

## COUNT III
## DELIBERATE INDIFFERENCE TO PAST, CURRENT, AND ONGOING UNCONSTITUTIONAL CONDITIONS AT NCCC UNDER THE EIGHTH AMENDMENT
### *(Against All Defendants)*

103. Plaintiff repeats, reiterates, and realleges each and every allegation contained in all other paragraphs of the Complaint herein with the same force and effect as if more fully set forth at length below.

104. The Eighth Amendment to the United States Constitution requires that state actors take reasonable measures to guarantee the safety and well-being of inmates in their custody

105. In light of the totality of the circumstances discussed above, Defendants - acting under color of state law - have subjected Plaintiff to inhumane conditions that have exposed and continue to expose Plaintiff and other inmates to a substantial risk of serious physical and

psychological harm and, as such, constitute cruel and unlawful punishment in violation of the Eighth Amendment.

106.     Defendants possess the ability to remedy the hazardous conditions in question, but have willfully failed to do so. In fact, their actions have exacerbated the risk of harm or injury to the inmates. Defendants have failed to address the ongoing leaks, overflowing sewage, or the broken or lifting tiles, allowing these conditions to persist unchecked, thereby increasing the likelihood of injury.

107.     Furthermore, Defendants restrict inmates' access to mops and cleaning supplies, providing them only at their discretion, which further contributes to the hazardous environment. To add further insult to injury, despite being fully aware that the concrete and steel floors are consistently subject to flooding, have broken or missing tiles, and are a hazard, Defendants provided Plaintiff with ill-fitting, traction-less rubber shoes, which are prone to slipping and wholly inadequate for the dangerous conditions present.

108.     Defendants have subjected and continue to subject Plaintiff to cruel and inhumane prison conditions that damaged him and which pose an unreasonable and unjustifiable risk of harm to his health, and has manifested and continues to manifest a pattern of deliberate indifference to this damage and risk of harm. The challenged conditions violate the Eighth Amendment to the United States Constitution.

109.     As a result of Defendants' intentional, wanton, reckless, grossly negligent, and deliberately indifferent actions, Plaintiff was caused to sustain bodily injuries, mental torment, night terrors and nightmares, depression, fear, loss of enjoyment of life, and other physical, mental, and psychological injuries, other special damages, has suffered great mental anguish, and has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and

counseling, all to Plaintiff's damage, in an amount to be determined at trial but not less than ONE MILLION DOLLARS ($1,000,000.00), plus punitive damages and attorney's fees.

## COUNT IV
## DENIAL AND FAILURE TO PROVIDE MEDICAL TREATMENT PURSUANT TO THE EIGHTH AND FOURTEENTH AMENDMENTS
### (*Against All Defendants*)

110.    Plaintiff repeats, reiterates, and realleges each and every allegation contained in all other paragraphs of the Complaint herein with the same force and effect as if more fully set forth at length below.

111.    Defendants had an affirmative duty to provide and administer health and medical services to Plaintiff and other NCCC pre-trial detainees.

112.    Defendants, as previously alleged, had a duty and obligation to provide Plaintiff and other NCCC pre-trial detainees reasonable and adequate health and medical services.

113.    Defendants, on information, had knowledge that the healthcare they provided and/or were responsible for providing to Plaintiff and other NCCC pre-trial detainees was deficient, inadequate, and incompetent.

114.    On information, the health and medical care provided by Defendants, or which they were responsible for providing, to Plaintiff failed to meet an acceptable standard of treatment and care in terms of modern medicine, technology, and current beliefs about human decency.

115.    On information, the health and medical care provided by Defendants, or which they were responsible for providing, created an excessive risk to Plaintiff, and the harm to which Plaintiff was exposed was sufficiently serious as to implicate his Constitutional rights.

116.    On information, Defendants knew that Plaintiff's medical condition constituted a serious need for immediate, competent, and adequate medical care and treatment.

117.    On information, Defendants knew of and ignored the aforesaid excessive risk to Plaintiff's health.

118.    The denial of adequate medical care as aforesaid created a condition of urgency, where pain, emotional distress, disability, permanent injury, or death was likely.

119.    Defendants' policies, practices, customs, actions, and failures to act constituted deliberate indifference to the serious medical needs of Plaintiff.

120.    Defendants were deliberately indifferent to the serious medical needs of Plaintiff.

121.    As a direct and proximate result of the foregoing, Plaintiff was subjected to great physical and emotional pain and suffering.

122.    Defendants' conduct demonstrated reckless and/or callous indifference to the federally protected rights of Plaintiff.

123.    As a direct and proximate result of the foregoing, Plaintiff was subjected to cruel and unusual punishment and denial of adequate housing, medical care, and treatment.

124.    As a proximate result of Defendants' intentional, wanton, reckless, grossly negligent, and deliberately indifferent actions, Plaintiff was caused to sustain bodily injuries, mental torment, night terrors and nightmares, depression, fear, loss of enjoyment of life, and other physical, mental, and psychological injuries, other special damages, has suffered great mental anguish, and has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling, all to Plaintiff's damage, in an amount to be determined at trial but not less than ONE MILLION DOLLARS ($1,000,000.00), plus punitive damages and attorney's fees.

## COUNT V
## MONELL
### (*Against Defendants COUNTY and LaROCCO*)

125.     Plaintiff repeats, reiterates, and realleges each and every allegation contained in all other paragraphs of the Complaint herein with the same force and effect as if more fully set forth at length below.

126.     Upon information and belief, it was the custom, policy, and practice of COUNTY and LaROCCO to tolerate, condone, and encourage Constitutional violations, such as those alleged by Plaintiff above, by failing to properly punish, charge, reprimand, and investigate allegations and incidents of misconduct by Corrections Officers.

127.     Specifically, COUNTY and LaROCCO have a policy and practice of allowing and fostering Constitutional violations at NCCC and inhumane living conditions by allowing and permitting their Corrections Officers to go unpunished and undisciplined in permitting such Constitutional violations to exist and such inhumane living conditions which present a danger to NCCC pretrial detainees.

128.     In doing so, COUNTY and LaROCCO implement and accede to a policy and practice that deprives inmates of their Constitutional rights and the baseline civilized requirements of life's necessities, that intentionally or recklessly subjects them to unnecessary and wanton infliction of pain, that imposes punishment that is cruel and unusual, and that violates inmates' rights under the First, Eighth, and Fourteenth Amendments to the United States Constitution.

129.     Defendants COUNTY and LaROCCO's policy, custom, pattern, and practice of such First, Eighth, and Fourteenth Amendment violations has materialized in serious harm to NCCC pre-trial detainees repeatedly.

130.    For Plaintiff in particular, Defendants COUNTY and LaROCCO's illegal policy has caused him to incur physical, emotional, psychological, and pecuniary harms.

131.    Employees of COUNTY and LaROCCO, such as HOLMES, DONNERY, and DOES in this action, were aware at all times alleged in this Complaint that their unconstitutional conduct would not be investigated or questioned, and that they would receive no reprimand or be punished for their conduct.

132.    Employees of COUNTY and LaROCCO, such as HOLMES, DONNERY, and DOES in this action, were aware at all times alleged in this Complaint that their unconstitutional conduct would not be investigated or questioned, and that they would receive no reprimand or punishment for their conduct and, further, that they would be indemnified from civil liability regardless of the illegality or unconstitutionality of their actions.

133.    By failing to supervise, train, and reprimand such Corrections Officers, COUNTY and LaROCCO caused the injuries to Plaintiff through the actions and inactions of HOLMES, DONNERY, and DOES.

134.    By maintaining a *de facto* policy of automatic indemnification, COUNTY and LaROCCO further caused the injuries to Plaintiff through the actions and inactions of HOLMES, DONNERY, and DOES.

135.    Upon information and belief, this custom, policy, and practice of COUNTY and LaROCCO to ignore complaints and/or widespread allegations of inhumane living conditions created an environment where foreseeable Constitutional violations by the Corrections Officers were rampant, including the violations of Plaintiff's Constitutional rights by HOLMES, DONNERY, and DOES.

136.     COUNTY and LaROCCO's failure to take action against HOLMES, DONNERY, and DOES involved in this incident and in other similar incidents was part of a custom, practice, and procedure of neglect and deliberate indifference that directly caused the injuries to Plaintiff.

137.     As authorized representatives of Defendants COUNTY and LaROCCO, the Corrections Officers' conduct constituted a custom, policy, and practice which renders Defendants COUNTY and LaROCCO liable to Plaintiff as a "Person" acting under the color of state law.

138.     These customs, policies, and practices which were enforced by Defendants COUNTY and LaROCCO were the moving force, proximate cause, or affirmative link behind the conduct causing Plaintiff's injuries.

139.     Had COUNTY and/or LaROCCO investigated serious complaints of inhumane living conditions and/or Corrections Officers and/or widespread allegations of same, Plaintiff's Constitutional rights would not have been violated.

140.     COUNTY and LaROCCO` are therefore liable for violations of Plaintiff's Constitutional rights as caused by HOLMES, DONNERY, and DOES, as described in more detail in the foregoing paragraphs; and Plaintiff has suffered damages therefrom.

141.     That, by virtue of COUNTY, LaROCCO, and other NCCC Supervisors' failure and refusal to adequately investigate HOLMES, DONNERY, and DOES' actions, acquiescence in HOLMES, DONNERY, and DOES' conduct, failure to take any remedial actions against HOLMES, DONNERY, and DOES, allowing HOLMES, DONNERY, and DOES to remain employed as officers with NCCC, gross negligence in their supervision of HOLMES, DONNERY, and DOES, and deliberate indifference to the rights of others by failing to act on information that Constitutional rights were being violated by HOLMES, DONNERY, and DOES, Defendants COUNTY and LaROCCO, which employed these Corrections Officers and policymakers during

the relevant time period, exhibited a *de facto* custom, policy, or practice of unconstitutional conduct sufficient for the imposition of municipal liability under *Monell v. Dept. of Social Services*, 436 US. 658 (1978).

142. As a proximate result of Defendants' intentional, wanton, reckless, grossly negligent, and deliberately indifferent actions, Plaintiff was caused to sustain bodily injuries, mental torment, night terrors and nightmares, depression, fear, loss of enjoyment of life, and other physical, mental, and psychological injuries, other special damages, has suffered great mental anguish, and has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling, all to Plaintiff's damage, in an amount to be determined at trial but not less than ONE MILLION DOLLARS ($1,000,000.00) plus attorney's fees.

## JURY DEMAND

143. Plaintiff demands a Trial by Jury of all causes of action so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff RYAN HORTON respectfully requests judgment against Defendants COUNTY OF NASSAU, NASSAU COUNTY SHERIFF ANTHONY J. LAROCCO, in his individual and official capacities, LT. DONNERY, in his individual and official capacities, CORRECTIONS OFFICER HOLMES, in his individual and official capacities, and CORRECTIONS OFFICER JOHN DOES #1-10 (fictitiously named), in their individual and official capacities as follows:

A. Under the First Count, in the amount of ONE MILLION DOLLARS ($1,000,000.00), plus punitive damages and attorney's fees;

B. Under the Second Count, in the amount of ONE MILLION DOLLARS ($1,000,000.00), plus punitive damages and attorney's fees;

C.      Under the Third Count, in the amount of ONE MILLION DOLLARS ($1,000,000.00), plus punitive damages and attorney's fees;

D.      Under the Fourth Count, in the amount of ONE MILLION DOLLARS ($1,000,000.00), plus punitive damages and attorney's fees;

E.      Under the Fifth Count, in the amount of ONE MILLION DOLLARS ($1,000,000.00), plus attorney's fees;

F.      Costs and disbursements of this matter; and

G.      Such other and further relief as the Court deems just and proper.

Dated: Garden City, New York
         August 20, 2025

**HORN WRIGHT, LLP**
*Attorneys for Plaintiff, Ryan Horton*

By:      */s/Pablo A. Fernandez*
         Pablo A. Fernandez
         400 Garden City Plaza, Suite 500
         Garden City, New York 11530
         Tel: 516.355.9696
         paf@hornwright.com